02-10-416-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT
 OF APPEALS
 SECOND
 DISTRICT OF TEXAS
 FORT
 WORTH
  
 
 


 

NO. 02-10-00416-CV

 

 


 
 
 IN THE INTEREST OF J.T.V.H., MINOR CHILD
 
 
  
 
 
  
 
 


                                                                                                                             

 

                                                                                                                             

------------

 

FROM THE
16TH DISTRICT COURT OF DENTON COUNTY

 

------------

 

MEMORANDUM OPINION[1]

 

------------

I.  Introduction

          In two issues, Appellant Mother appeals the
termination of her parental rights to J.T.V.H.  We affirm.

II.  Factual and Procedural Background

          Mother and J.T.V.H. tested positive for
methamphetamine, and Child Protective Services (CPS), through the Department of
Family and Protective Services (DFPS), removed J.T.V.H. from Mother and created
a service plan for her, which the court ordered her to complete.  Mother remained
drug-free for a year and, after receiving an extension of time, she completed most
of her service plan requirements, but by the time of the trial, she had not established
or maintained stable housing or employment, and she had not consistently paid
child support.  In a vote of 10–2, the jury found that Mother had endangered J.T.V.H.,
that she had failed to comply with the requirements specifically establishing
actions necessary for his return to her, and that it was in J.T.V.H.’s best
interest that her parental rights be terminated.[2]
 See Tex. Fam. Code Ann. § 161.001(1)(D), (E), (O), (2) (West Supp.
2010).  The trial court terminated Mother’s parental rights on the grounds
found by the majority of the jury, and this appeal followed.

III.  Legal Sufficiency

          In her second issue, Mother argues that the
evidence is legally insufficient to support the best interest finding.[3]

A.  Standard of Review

          Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code
Ann. §§ 161.001, 161.206(a) (West 2008).  Evidence is clear and convincing
if it “will produce in the mind of the trier of fact a firm belief or
conviction as to the truth of the allegations sought to be established.”  Id.
§ 101.007 (West 2008).  Due process demands this heightened standard
because termination results in permanent, irrevocable changes for the parent
and child.  In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); see In
re J.A.J., 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for
termination and modification).

          In evaluating
the evidence for legal sufficiency in parental termination cases, we determine
whether the evidence is such that a factfinder could reasonably form a firm
belief or conviction that the grounds for termination were proven.  In re
J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We review all the evidence in the
light most favorable to the finding and judgment.  Id.  We resolve any
disputed facts in favor of the finding if a reasonable factfinder could have
done so.  Id.  We disregard all evidence that a reasonable factfinder
could have disbelieved.  Id.  We consider undisputed evidence even if it
is contrary to the finding.  Id.  That is, we consider evidence
favorable to termination if a reasonable factfinder could, and we disregard contrary
evidence unless a reasonable factfinder could not.  Id.  We cannot weigh
witness credibility issues that depend on the appearance and demeanor of the
witnesses, for that is the factfinder’s province.  Id. at 573, 574.  And
even when credibility issues appear in the appellate record, we defer to the
factfinder’s determinations as long as they are not unreasonable.  Id.
at 573.

          There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.  In re R.R., 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child’s best interest.  Tex. Fam. Code Ann. § 263.307(a) (West
2008).  The following factors, among others, should be considered in evaluating
the parent’s willingness and ability to provide the child with a safe
environment:  the child’s age and physical and mental vulnerabilities; the
results of a psychological evaluation of the child’s parent; whether there is a
history of abusive or assaultive conduct by the child’s family; whether there
is a history of substance abuse by the child’s family; the willingness and
ability of the child’s family to seek out, accept, and complete counseling
services and to cooperate with and facilitate an appropriate agency’s close
supervision; the willingness and ability of the child’s family to effect
positive environmental and personal changes within a reasonable period of time;
whether the child’s family demonstrates adequate parenting skills, including
providing the child with a safe physical home environment and protection from
repeated exposure to violence even though the violence may not be directed at
the child; and whether an adequate social support system consisting of an
extended family and friends is available to the child.  Id. § 263.307(b);
R.R., 209 S.W.3d at 116.

          Other,
nonexclusive factors that the trier of fact in a termination case may use in
determining the best interest of the child include:

(A)     the
desires of the child;

 

(B)     the
emotional and physical needs of the child now and in the future;

 

(C)     the
emotional and physical danger to the child now and in the future;

 

(D)     the
parental abilities of the individuals seeking custody; 

 

(E)     the
programs available to assist these individuals to promote the best interest of
the child;

 

(F)     the
plans for the child by these individuals or by the agency seeking custody;

 

(G)     the
stability of the home or proposed placement;

 

(H)     the
acts or omissions of the parent which may indicate that the existing
parent-child relationship is not a proper one; and

 

(I)      any
excuse for the acts or omissions of the parent.

 

Holley v.
Adams, 544 S.W.2d 367, 371–72 (Tex. 1976).

          These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when appropriate.  In
re C.H., 89 S.W.3d 17, 27 (Tex. 2002).  Furthermore, undisputed evidence of
just one factor may be sufficient in a particular case to support a finding
that termination is in the best interest of the child.  Id.  On the
other hand, the presence of scant evidence relevant to each factor will not
support such a finding.  Id.

B.  Evidence 

          In addition to testimony by Mother and her
stepmother J.V.H., the other witnesses at trial were J.T.V.H.’s Court Appointed
Special Advocate (CASA) worker Diane Reynolds and her supervisor, Cheri Fry;
Vanette Meachem, Mother’s START case manager during most of Mother’s stay at
the Salvation Army, and Katrice Goodman, Mother’s interim case manager after
Meachem; Dr. Catherine Bass, who performed Mother’s psychological evaluation; CPS
caseworker Candice Williams; S.T., J.T.V.H.’s foster mother; Mother’s counselor,
Deborah Boyles; Mother’s friends Sarah Brauderick and Geena McKinney; and
Mother’s Narcotics Anonymous (NA) sponsor Connie Stockton.  The trial court
also admitted into evidence Mother’s Mental Health Mental Retardation (MHMR),
Salvation Army, counseling, and psychological evaluation records.

1.    J.T.V.H.

          J.T.V.H. was born after Mother had a
one-night stand with Father.[4] 
In May 2009, when J.T.V.H. was two, CPS removed him from Mother.  Reynolds
described J.T.V.H. as “[a] sweet little boy” who, when she met him in July
2009, played by himself on the floor.  She stated that this concerned her
because children often run around and play at his age.

          In August 2009, CPS placed J.T.V.H. with
S.T.—Father’s ex-wife with whom he has a six-year-old daughter, J.T.V.H.’s half-sister—and
J.T.V.H. remained with S.T., her husband B.T., and his half-sister during the
pendency of the case.[5]
 Like Reynolds, S.T. noted that J.T.V.H. was very quiet and did not interact
much at first, but she said that within three weeks, J.T.V.H. had become
comfortable with a routine and started talking and playing.  J.T.V.H. and his
half-sister have a typical sibling relationship, and Reynolds stated that he
has become “[a] very active and rambunctious three-year old.”

          J.T.V.H. was developmentally delayed in his
speech at the beginning of the case, “doing more mumbling, grunting, and not
communicating verbally.”  At CASA and CPS’s recommendation, Early Childhood
Intervention (ECI) evaluated J.T.V.H. and began providing speech therapy for
him.  ECI indicated to S.T. that at the age J.T.V.H. came to her, he should
have had twenty-five words in his vocabulary, but “[h]e didn’t have any words
to say.”

          Mother said that she did not think J.T.V.H.
had any problems, that he was fine, and that she “never had any issues with
him.”  Mother also said that she did not think J.T.V.H.’s delayed speech was
related to her drug use because she smoked drugs in the bathroom with the door
shut when he was home.  Mother would send J.T.V.H. to stay with her parents on
the weekends and would pick him up on Monday while still high.

2.    J.T.V.H.’s Caregivers

(a) Mother

          Sarah Brauderick, who Mother met in college
and who knew Mother’s stepmother (J.V.H.), her biological mother (V.K.), and her
father (M.V.H.), had been Mother’s roommate in The Colony.  She moved out and
then called CPS about Mother’s drug use.  Although Mother was very angry at
being reported to CPS, they became friends again three or four months after
Mother finished rehab.  Brauderick indicated that Mother took her CPS service
plan seriously.

          At the time CPS removed J.T.V.H. via writ of
attachment, Mother and J.T.V.H. had been living with Geneva, an active
methamphetamine user, and Geneva’s daughter; Mother and Geneva used methamphetamine
together.  Mother said that her father and stepmother never suspected that she
was on drugs “until the whole CPS stuff happened.”

          During her July 2009 sessions with her first
counselor, Gayle Spagnola, Mother blamed her hometown, The Colony, for the
drugs’ availability and the number of drug users who made the drugs available
to her.  Mother said that she did not like Spagnola because she always felt worse
about herself after an appointment than before, and she felt that Spagnola
judged her.  Reynolds said that Mother went to her last appointment with
Spagnola “high and . . . just out of control[,] . . . using profane language,”
and Spagnola told Mother to get herself together and take counseling more
seriously before she returned.  Mother did not return to counseling with
Spagnola.

          Mother began shooting methamphetamine
instead of just smoking it when CPS removed J.T.V.H. from her, and she started
using it two to three times per day.  Mother did not start any of the services
on her service plan on time, and she missed some visits with J.T.V.H. before
she entered inpatient drug rehabilitation because she was “real messed up.”  She
also missed her first psychological evaluation—scheduled prior to rehab—because
of her drug use.  Upon her medical discharge for influenza, Mother relapsed into
drug use when she went back to The Colony,[6]
but she eventually completed rehab.

          A November 2009 MHMR report indicated that
Mother blamed the rehab facility for her relapse because of the medical
discharge; the same report also revealed that Mother had attempted suicide
while in high school and had a childhood history of physical and sexual abuse.  A
January 2010 MHMR report recited that Mother had been sexually abused by an
uncle during childhood, that her father M.V.H. had physically abused Mother and
her brother, and that M.V.H.’s abuse of Mother continued from childhood through
the recent past.  Mother reported this abuse during her psychological
evaluation with Dr. Bass in February 2010 and again to Boyles, her second
counselor.  Mother did not report the sexual abuse when she was a child because
she did not want to “break the family up” and because she was afraid that
M.V.H. would kill her uncle.

          In her psychological evaluation, in addition
to her father’s physical abuse of her and her brother, Mother revealed that her
biological mother, V.K., left home when Mother was one or two years old, and
Mother was raised primarily by M.V.H. and J.V.H.  Mother started smoking
marijuana in high school, which she said helped her to stop cutting on her legs
and arms.  She was hospitalized at age seventeen after a drug overdose put her
into a coma for three days, and she started using methamphetamine two years
later.  As an adult, she smoked marijuana with V.K., and in 2009, she was
arrested for assault after an altercation with V.K..

          Dr. Bass testified that all of these
incidents concerned her, as well as the physical abuse by M.V.H. when Mother
and her brother were children, and the sexual abuse of Mother by her uncle.  Dr.
Bass also said that she was concerned that Mother still had no job and no
transportation and that stress and lack of stability might cause Mother to
relapse.  Further, because of the type of drugs Mother had used and Mother’s
issues, Dr. Bass felt that Mother would need counseling and the help of
multiple professionals in order to stay drug free.  Dr. Bass said she would not
recommend that J.T.V.H. be returned to Mother “until there’s more
stabilization.”  Dr. Bass observed that a parent’s goal of staying sober did
not trump a child’s right to have stability, security, safety, and good
parenting by that parent and that staying off drugs was a minimum necessity,
but not sufficient by itself, for taking care of and raising a child.

          Mother testified that her drug use had been
a “coping mechanism” to help with her depression and bipolar condition; after
entering rehab, Mother began taking lithium and other medications to treat
these conditions.  A November 2009 MHMR report indicated that Mother needed
more time to stabilize on her medication, that she had a set date to enter the
Salvation Army program (although she had not completed her relapse prevention
assignments or found a temporary sponsor), and that she had not talked to her
CPS worker, even though the CPS worker had called to talk with her.

          Mother successfully completed rehab in
December 2009.  Her discharge summary lists all of the services Mother received
while in rehab but included a notation that although Mother completed all of her
work assignments, it was clear that her only purpose for treatment was to
comply with CPS’s requirements and that she did not try to or seem interested
in obtaining a sponsor while in treatment.

          After rehab, Mother moved into the Salvation
Army, where she tested negative for drugs in over eighty random drug tests and completed
a number of programs, including a seven-week job skills workshop that included
resume-writing, interviewing, and job search skills.  The Salvation Army
provided Mother with case management, shelter, job referrals, and meals.

          Boyles began counseling Mother in February
2010 and stated in one of her reports that Mother seemed motivated and
determined to meet her goals so that she could raise J.T.V.H. independently.  Boyles
said that Mother’s number one issue over the last sixteen months was to get her
son back and to stay clean; that she thought Mother had done some of the
recommendations from her psychological evaluation, which included supervised
contact with J.T.V.H., participation in therapeutic services, and development
of better coping and decision-making skills; and that Mother continued to work
on these tasks.  Boyles said that she thought Mother was intimidated by
authority figures, not lazy.

          Mother started attending Community Addiction
Treatment Services (CATS) in March 2010; she completed CATS and a six-to-seven
month outpatient rehab program through MHMR but could not explain why it took
her three months after completing inpatient rehab to start attending CATS.  Mother
also successfully completed her parenting classes in March 2010, but at trial,
she could not say what developmental milestones were appropriate for a
three-and-a-half-year-old child.  Dr. Bass noted that Mother was intelligent,
and she agreed that Mother should be able to indicate what she learned from her
parenting classes.  Dr. Bass added that she would wonder why Mother could not
and might infer that Mother had attended the classes but did not take them “to
heart enough to maintain” and use the information when it became applicable.

          Mother’s Salvation Army records include some
written disciplinary actions for various rule violations.  Salvation Army rules
included not leaving the facility without a weekend pass and not retaining
possession of prescribed medications.  In March, Mother received a written
disciplinary action report for a curfew violation.  Her handwritten response on
the report was:  “I didn’t intentionally disobey.  I just misunderstood
instructions and I am sorry.”

          In April, Mother received three more
disciplinary action reports for unauthorized use of facility door access code,
refusal to turn her medications over to Salvation Army staff, and exposing her
stomach on the playground.  Mother’s handwritten response on the facility door
report was:  “Someone had to use restroom. . . .  I knew code so punched it but
was never told not to—but I am sorry and know better now.”  At trial, Mother
explained that it was an elderly lady who “was almost like going to pee in her
pants” and that her instinct told her to unlock the door to help.  Mother did
not write a response to the report involving her medications, but at trial she
acknowledged that she had kept her medications longer than she was supposed to
instead of immediately turning them over to Salvation Army staff.

          Mother’s handwritten response to the
playground report and her explanation at trial was that she was with other
women who were tanning and exposing their stomachs; one of the women got in
trouble for it and implicated everyone else.  Meachem stated that the
playground area was not an appropriate location to tan or pull one’s shirt up
because of the homeless men walking around nearby.

          Mother also got in trouble once for failing
to double-check with a case aide that her room was clean enough before leaving
on a weekend pass.  Mother acknowledged that she and her roommates were very
bad at keeping their shared room clean.  She said that the staff probably noted
every week that she and her roommates were not living in a clean room, and she
admitted that it might be a problem taking care of a small child if she could
not keep her own room clean.

          Meachem stated that Salvation Army residents
are not supposed to drink alcohol on a weekend pass, but Mother admitted that
she went out on New Year’s Eve, drank alcohol, and became intoxicated that
night and that on around three weekend passes, she engaged in drinking
activities with friends and became “a little buzzed off a couple of beers.”  And
Mother admitted that she did not always follow the rule requiring her to sign
out and sign back in every time she left the Salvation Army facility, stating,
“I broke, you know, a little rule here and there, and I’m sorry.”

          In June 2010, Mother’s MHMR counselor
reported that Mother’s lithium dosage had been changed, making her less manic
and calmer, that Mother was able to see J.T.V.H. once a week for two hours,
that Mother was working three days a week and was trying to find a full time
job, that Mother was attending NA daily and had a sponsor, and that Mother had eight
more CATS group sessions and one more individual session to complete.  Three
days later, Mother obtained a MHMR caseworker, and a Salvation Army report
noted that Mother hoped to obtain housing via MHMR’s sponsorship.

          On August 6, 2010, Fry contacted Meachem to
find out where Mother went when she left the Salvation Army on the weekends.  The
Salvation Army records reflect that Mother filed weekend pass requests on the
following dates:

·       
January 21, 2010 (Chris in
Alvarado, approved); 

·       
February 3, 2010 (Chris in
Alvarado, approved); 

·       
February 11, 2010 (Chris in
Alvarado, approved); 

·       
March 4, 2010 (Suni’s family in
Cleburne, approved); 

·       
March 15, 2010 (V.K. in Terrell,
not submitted); 

·       
March 18, 2010 (Sponsor in Fort Worth, denied with notation, “No
Overnight until Room is Clean!”); 

 

·       
March 31, 2010 (M.V.H. and J.V.H., denied with notation “You are
still on restriction from weekend pass—you can request a DAY PASS!”); 

 

·       
April 8, 2010 (Sponsor Angela in
Fort Worth, approved); 

·       
April 22, 2010 (incomplete form to
visit friends in Fort Worth, approved); 

·       
April 29, 2010 (Brandy in Fort Worth, denied for “continued
behavior issues—uncleanliness of room”); 

 

·       
May 7, 2010 (V.K. in Terrell,
denied as turned in too late); 

·       
May 10, 2010 (V.K. in Terrell,
approved); 

·       
May 18, 2010 (Sponsor Connie on
road-trip to NA convention, approved); 

·       
June 10, 2010 (Brauderick in Plano, filled out but did not seek
approval); 

 

·       
June 17, 2010 (Brandy in Fort
Worth, only extended hours approved); 

·       
June 24, 2010 (Brandy in Fort
Worth, approved); 

·       
July 7, 2010 (Tiffany in The
Colony, approved); 

·       
July 22, 2010 (Geena and Mark
McKinney in Dallas, approved); 

·       
July 29, 2010 (Brauderick in
Dallas, approved); 

·       
August 5, 2010 (Dede in Fort
Worth, denied); 

·       
August 12, 2010 (Brandy in Fort
Worth, partial approval for extended hours); 

·       
August 16, 2010 (Rebecca in
Carrolton, approved); 

·       
August 20, 2010 (Rebecca in
Carrollton, approved); 

·       
September 1, 2010 (Brandy in Fort
Worth, approved); 

·       
September 9, 2010 (Emma in
Bedford, approved); and

·       
September 23, 2010 (Brandy in Fort Worth, approved).

 

          Mother said that she occasionally had other
people sign in for her in her NA group but claimed that she always went to the
meetings.  She explained the discrepancy between a sign-in sheet for the NA
meeting dated the same day as a weekend pass that indicated that she was
actually in Alvarado at the time of the meeting by stating, “a zillion times .
. . I filled out a pass and . . . never left the Salvation Army.”  She also stated
that although V.K. currently uses drugs, V.K. did not use drugs on the weekends
that Mother stayed with her.  Mother met some of the people she visited on
weekend passes in rehab, in CATS, at the Salvation Army, or at NA.  Fry said
that after reviewing Mother’s Salvation Army records, she was concerned about “every
weekend, she went to someone—I can’t say every weekend she went to someone
different, but there was no consistent someone that she was going to and that
seemed random.”

          Meachem, who met with Mother around once a
month from December 2009 until August 2010, testified that in her opinion,
Mother was not capable of making decisions for herself and her child because
Mother was immature.  Meachem saw Mother make only minimal effort in her
participation in Salvation Army programs but, as far as she knew, Mother never
had any problem finding transportation to use her weekend passes or to go
anywhere she wanted to go, even though she occasionally had difficulty getting
to her services, particularly visitations and court hearings.  Meachem said that
she was surprised that Mother still had not secured housing, a job, or a plan
for her future with J.T.V.H. “[b]ecause the tools were there for her to—to
use.  I just don’t think she really put forth that extra effort to make it
really happen.”  Meachem told Fry that she did not feel that Mother was ready
to be a mother due to her lack of maturity and responsibility.

          With regard to Mother’s bond with J.T.V.H., J.V.H.
said that when J.T.V.H. and Mother were together, J.T.V.H. “was always just . .
. . talking to her and touching her and hugging her and sitting on her lap,”
and that it was awful when Mother would have to leave her visits with him.  In
contrast, Reynolds stated, “It is apparent [J.T.V.H.] loves his mom, but there
was not a mother/child bond” based on what she had observed of their visits.  Reynolds,
who admitted on cross-examination that she did not have any psychological training
and based her opinion on her own parenting experience, elaborated by saying
that when the visits began, Mother “would normally just sit in the chair and
[J.T.V.H.] would play by himself on the floor,” with little interaction between
them.[7]
 After completing her parenting classes, Mother started sitting on the floor
and trying to interact with J.T.V.H. Williams, Mother’s CPS caseworker,
admitted that she had no reason to believe that Mother was not bonded with
J.T.V.H.

          Mother said that Reynolds was the person
with whom she spoke the most, that she did not talk with Williams, and that she
was afraid of Fry.[8]
 Mother never asked anyone about how to get more time to visit with J.T.V.H.,
explaining that she felt that Reynolds and Williams were completely against
her.

          In her relapse prevention plan, Mother
identified the following as her high risk situations:  parties, watching
sports, celebrating, having a “long day,” and suffering the loss of a loved
one; she identified feeling overwhelmed, depressed, anxious, or wanting to
celebrate as causing her urges to use drugs; and she identified the following
as social pressure to use drugs:  going out to dinner or a BBQ, being around
old friends, being at the lake with friends, and going to a club.  Her plan to manage
these situations and urges were to not go to a party unless she could say “no,”
to watch events with sober friends, to stay productive and concentrate on
positive and logical thinking, to exercise and stay busy, to stay away from
users, to focus on the “big picture,” to substitute dancing in lieu of drinking
at clubs, and to “let go and let God.”  She listed that she would use her
leisure time for: (1) exercise, (2) going to the library/museum/animal
shelters, (3) being with her son and being “mama again,” (4) going to church,
and (5) going to NA meetings.  With regard to her subsequent relapse prevention
plan, Mother intended to “stay in close contact with [her] sponsor and work on
the [twelve] steps.”

          Major Elizabeth Anderson provided a letter
of recommendation for Mother, stating that Mother had “participated in process
and discussion groups and ha[d] shown growth” and that she was very pleased
with the growth she saw in Mother, who was “working hard to make changes and
really wants to do better so she can start a new life with her son!”  Meachem
testified that Anderson was the new major at the Salvation Army and that Anderson
started after Meachem left.

          When asked why it was best for J.T.V.H. to return
to her, Mother told Fry, “Because I’m his mother,” with no other reason.  Mother
told the jury that above anything else, they should consider that the most
important thing she had learned during the CPS process was to be sober.  She
admitted that she had no job, no home of her own, no car, and no money.  Mother
explained that she loved her son before adding that she went to NA meetings
“for [her] son and . . . for [her]self,” stating, “if I’m not here, then how am
I going to do anything for him?  I mean above all we go for ourselves, but of
course he was second.”

(b) Mother’s Family

          By the time of the trial, Mother had moved
back in with her father M.V.H. in The Colony and planned to move to Iowa to
live with her stepmother J.V.H.  Other than J.T.V.H., Mother’s family is
composed of M.V.H., J.V.H., and her biological mother V.K.  J.V.H. married M.V.H.
in 1990 and divorced him in 2007, but they only stayed apart for four months,
and J.V.H. said that she still considered them married.  M.V.H. has been
retired since 2006 or 2007, the same year that they broke up and he left J.V.H.
with a significant amount of the household credit card debt.  She said M.V.H. suffered
from depression at the time and was not at their divorce hearing because he
could not be located.  He returned in time for her birthday in March 2007.

(1) Abuse 

          V.K. told S.T. that the reason she left
M.V.H. was because he was abusive, and Mother said she had told her MHMR case
manager that M.V.H. had abused her and her brother when they were children. 
Mother said that this was why M.V.H. and J.V.H. were initially denied a home
study for J.T.V.H.’s placement.

          J.V.H. said that M.V.H. now treated Mother
as an adult, but she admitted that M.V.H. spanked Mother when she was younger and
that when Mother was a teenager, Mother thought this was abusive.  J.V.H. said
that M.V.H. never hurt Mother or her brother physically and that she never saw
him beat, hurt, or abuse his children.  McKinney, who had known Mother
since high school, said that she saw M.V.H. unnecessarily discipline Mother but
that he never was abusive, just stricter than Mother liked.

          J.V.H. agreed that if Mother had reported that M.V.H. had
abused her and her brother, Mother would have been lying.  However, when asked
about her biological son’s comments about M.V.H., J.V.H. testified as follows:

Q.  Would it surprise you that
after giving him as a reference on the home study, he could not recommend
[M.V.H.] but could recommend you?

 

A.  No, it wouldn’t surprise me.

Q.  Would it surprise you that he accused [M.V.H.] of
abusing him?

A.  No, it wouldn’t surprise me.

Q.  And that he felt you turned a blind eye to it and
didn’t stick up [for] him?

A.  That he would say that, no, it doesn’t surprise
me.

Q.  Is he prone to lying?

A.  No.

J.V.H. explained that her son had wanted to stay with
his father and did not want to be disciplined by another man.

          Mother claimed that her relationship with
M.V.H. had been better since J.T.V.H. was born, that M.V.H. was completely
different with his grandchild, and that she had talked with him about disciplining
J.T.V.H.  She said that she did not recall telling DFPS in April 2009 that
there was no way she could live with her father if she did not have some sort
of drug to help her get by, but Reynolds said that Mother told her many times
that she would not go back to The Colony to live with M.V.H. because it would
not be a good place for her.

          Brauderick said she had never seen M.V.H. be
pushy or violent with Mother or J.V.H.  S.T., who was out in the hallway when
J.V.H. finished testifying, overheard J.V.H. say to Brauderick, “Don’t be
nervous, honey, I have a lot more to hide than you do.”

(2) Home Study

          When asked how many times M.V.H. referred to
her as a “bitch” during the home study, J.V.H. said “Well, I have no idea.”  She
said that he did not say it “in derogatory terms” and “wasn’t being derogatory”
to her but admitted that it probably was not appropriate for him to do while
their house was being evaluated for placement suitability.  J.V.H. also
recalled M.V.H. telling the caseworker that marijuana is a completely different
drug now than when he was a kid, which she agreed was inappropriate.  She did
not recall M.V.H. telling the caseworker that he had only fought men who were
bigger than him and that he had never lost a fight but said, “That sounds like
something he would say.”

          When asked whether she would agree with the
statement her brother gave CPS for the home study, that M.V.H. was lazy,
antiauthoritarian, and unstable, J.V.H. replied, “Well, he’s antiauthoritarian,
I would say, but he’s not lazy.”  At a June 2010 meeting, Mother told Boyles
that she thought M.V.H.’s stability was due to J.V.H. but that J.V.H. might take
a job out-of-state and M.V.H. had to decide whether he would join her.  Fry
testified that when she asked J.V.H. a week before trial if M.V.H. would be
moving to Iowa, J.V.H. said, “No,” that he did not like Iowa, and that “it was
far too cold for him.”

          In July 2010, Mother told Boyles that she
had to calm M.V.H. when he became very upset about J.T.V.H.’s birthday party being
changed due to a miscommunication.  M.V.H. did not testify at trial; J.V.H.
said that M.V.H. did not pursue visits with J.T.V.H. “[b]ecause it tore him
apart to see [J.T.V.H.] and not be able to take him with him.”

(3) Drug Use

          When asked about Mother’s methamphetamine
use, J.V.H. said she had been unaware of it because she had never been around
drugs, stating, “I just thought she was acting strange.”  J.V.H. admitted that
she had been very naïve but said that now that she knew how to recognize
drug-use, she would not stand by and let Mother use them or expose J.T.V.H. to
them.  J.V.H. acknowledged that she had not taken any classes offered for
family members of substance abusers, even though she knew that such classes and
resources were available, that she had never been around any drug users besides
Mother in the last year, and that she had only seen Mother four or five times
in the last year and a half.

          J.V.H. acknowledged that in May 2009, she
knew CPS was investigating Mother.  J.T.V.H. was in J.V.H.’s home on May 22,
the day he was taken by CPS for his drug test.  When CPS returned him, J.V.H.
let Mother take him to V.K.’s house without calling the police or CPS and
without making any effort to stop Mother.  She said that she let Mother take
him because although Mother was being investigated, there was no proof at that
time.  She admitted that she did not know if Mother had been high when she
picked J.T.V.H. up and that in retrospect, it was a bad decision.  J.V.H.
elaborated:

[Mother] is a
wonderful mother, and she was making—she made some mistakes.  If I thought [J.T.V.H.]
was in danger at the time, if I truly thought he was in danger at that
particular moment, I wouldn’t have let her.  

          I’m trying
to think if I was even there at the time, I’m not sure.  I might have been at
work.  I’m not sure.

 

          Mother testified that V.K. smoked “pot”
occasionally and that she was sure her mother was a drug addict.  S.T. stated
that V.K. had gone to jail for a couple of years “for drugs” when S.T. was five
years’ old.

          With regard to M.V.H., J.V.H. said that he did
not use drugs and that although he drank beer, she had never seen him drunk.  She
admitted that M.V.H. had told her that he used drugs when he was younger and
that he was not into “big government,” but she did not recall telling DFPS that
her husband was a “stick-it-to-the-man kind of guy.”  Fry stated that both
M.V.H. and J.V.H. took drug tests for the home study and both were clean.

(4) Other 

          Fry talked about M.V.H. with J.V.H. a week
before trial and testified that J.V.H. said, “[Y]ou’re young and you’re female
and you don’t have the life experience that you need.  When you talk to him,
he’s going to be defensive, so keep that in mind.”  Fry repeated, “Her words
were, I just want you to be aware,” to which Fry said, “okay.”  At that time,
Fry did not feel like it was a safe environment for her to try to enter.

          J.V.H.’s version of their conversation was
that she told Fry, “[W]hen you talk to [M.V.H.], understand that you’re young,
and you haven’t raised children, and he’s had a lot more experience, and he
raised his kids by himself before I came along.”  She added, “He wouldn’t take
real well to somebody just barging in the house and criticizing his
child-rearing skills.”  She also gave the following testimony about this issue:

Q.  Okay.  To be aware that she’s
young, he wouldn’t like that; she’s female, he won’t like that.  Why is that? 
Why won’t he like that?

 

A.  I explained to her that she’s
going to try and tell him he’s done something wrong, and he’s older than she
is, and he raised his kids alone for five years, he does have some definite
ideas.  And for a young person to start telling an older person how to do
things, yeah, that might offend him.

 

Q.  Okay.  How old is [Mother]?

 

A.  28.

 

Q.  Okay.  And what’s going to
happen if she starts telling [M.V.H.] what to do with [J.T.V.H.] if this jury
returns him?

 

A.  I don’t know that she’s—I
don’t know that she’ll—I can’t even visualize that.

 

Q.  Who will be taking care of
[J.T.V.H.]?  [Mother] or [M.V.H.]?

 

A.  While she’s at work,
[M.V.H.].

 

Q.  And you don’t anticipate any
problems between how to raise a three-year old between [M.V.H.] and [Mother]?

 

A.  No.  There wasn’t before when we watched him.

Q.  Okay.  There’s no likelihood that that would come
up?

A.  I don’t think so.

Q.  Okay.

A.  I can’t guarantee that.  I can’t see the future.

Q.  Okay.

The trial court also admitted and allowed publication
to the jury of Petitioner’s Exhibits 10, 11, and 12, which showed that M.V.H. received
fifteen months’ community supervision for charges of fleeing a police officer
and resisting arrest[9]
and a $300 fine for a misdemeanor assault charge.[10]

          J.V.H. admitted that she told CPS that she
would not release Mother’s phone number because to do so would violate Mother’s
trust and if she violated Mother’s trust, then Mother would not communicate
with her.  J.V.H. said that she did not refuse to give the number to help
Mother avoid CPS and that she realized the case was about J.T.V.H., not Mother.

          J.V.H. did not know what NA group Mother was
currently attending or when; she knew of Mother’s sponsor but did not know her.
 She assumed that the Salvation Army had required Mother to attend NA when she
lived there and said that Mother now was requiring herself to go.  J.V.H. kept
alcohol in the house for guests but did not know that alcohol could be a
relapse trigger.

(c) J.T.V.H.’s Foster Family

          Twenty-seven-year-old S.T. and her
thirty-four-year-old husband B.T. celebrated their two-year anniversary during
the week of trial and have lived in their home for a little over two years.  S.T.
is a hairstylist and a student at Texas A&M Commerce, studying early
childhood education, and B.T. is a Dallas police officer.  S.T. said that she
had been a hair stylist for five-and-a-half years, that her daughter was almost
two when she divorced Father, and that she managed to pay for her own house and
work while a single mother.  S.T. works twenty to thirty hours per week and is
enrolled in eighteen credit hours.  B.T. works from 7 a.m to 3 p.m., Monday
through Friday.  S.T. testified that they were prepared to adopt J.T.V.H., that
she loves him, and that she and her husband are bonded with him.

          Mother’s mother V.K. had been a friend of
S.T.’s family throughout S.T.’s life.  S.T. became involved in the case when
V.K. called her and told her that CPS has taken J.T.V.H., and S.T. volunteered
to take him.  Over the last year, S.T. and B.T. have taken J.T.V.H. and his
half-sister to birthday parties and get-togethers at V.K.’s house.  S.T. has
let J.T.V.H. spend the night at V.K.’s house a few times and has let her
daughter spend the night there once.  She did not ask CPS for permission but
said that she did not remember whether CPS had told her she was supposed to
obtain CPS approval before allowing J.T.V.H. to stay overnight at someone’s
home.  S.T. said that she did not know V.K. was still using drugs and that V.K.
told her that CPS would not place J.T.V.H. with her because of V.K.’s criminal
record.  S.T. said that J.T.V.H. brought home toys, but not clothing, from
visits with Mother and that he never appeared to be traumatized or to suffer
from separation anxiety after a visit.  In the fifteen months before trial,
Mother called no more than five times to check on J.T.V.H. even though she knew
how to contact S.T. and could do so at any time.[11] 
S.T. said that it would be best for J.T.V.H. to stay with her and her husband
and that it would probably be detrimental to J.T.V.H.’s progress to leave her
home and his routine.

          Reynolds stated that J.T.V.H. functioned
very well with S.T., B.T., and his half-sister, observing that he was “[h]appy,
talking, laughing, running around.  You could tell he was happy and loved.”  Fry
stated that S.T. and B.T. were incredible parents in that they more than met
his needs, loved him, and provided stability and a family for him.  Mother said
she could not imagine S.T. raising J.T.V.H., even though she understood CPS’s
concern about her history of drug use.

3.    Mother’s Housing

          Mother participated in the Salvation Army’s
START program, a six-to-eight month program, but she wanted into the First
Choice program, which provided similar services over eighteen months.  Both
programs help chemically dependent women beat their addiction problems and
transition to housing and employment through job and housing search assistance,
but in First Choice, children can stay with their mothers and the Salvation
Army provides day care while the mothers work their services.

          To qualify for First Choice, the Salvation
Army needed a commitment from CPS that J.T.V.H. would be placed with Mother or
reunited with her within ninety days.  Further, Mother would have to pass a
physical, and Mother could not have a relationship with anyone currently in
First Choice.

          Fry said that although she had originally
advocated for Mother to be placed in First Choice, Salvation Army personnel
told her that this would not be possible because on a random room sweep, they
found photos of Mother and another woman, who was already in First Choice with
her child, that led them to conclude that Mother and the woman were in a
romantic relationship.  Fry also said that based on her contact with the
Salvation Army, she learned that Mother did not seem to qualify as one of the
highly motivated people who would be considered for First Choice, a competitive
program with only thirteen beds.  Fry learned from the Salvation Army that the
First Choice spots were given to prime candidates who could make the most use
of the program in beating addiction, transitioning to housing and employment,
and becoming self-sustaining members of society.  Mother had not been able to
do that in the nine or ten months that she had already been at the Salvation
Army.

          Reynolds, who toured First Choice with Fry
and First Choice’s director, stated that based on her conversation with the
director and the Salvation Army reports, she became concerned that Mother would
not qualify, but she also said that Mother lost the First Choice option because
CASA and CPS did not agree to the reunification of Mother and J.T.V.H.  Meachem
and Goodman, Mother’s interim Salvation Army case worker after Meachem left,
agreed that Mother did not qualify for First Choice because she had not been
reunited with her child.

          Getting into First Choice appeared to be
Mother’s only plan for housing, and this worried Fry, particularly since,
according to Boyles, as of April 2010, Mother knew that First Choice was not
available to her.  In May, Fry encouraged Mother to look elsewhere for stable
housing and directed her to MHMR and its housing options, but in July, Mother
and Boyles met with two Salvation Army administrators about First Choice.  Mother
was present at a July hearing when Fry testified that CASA did not feel Mother
had made significant strides in her service plan in obtaining housing and
long-term employment.  In August, Meachem told Fry that Mother was not ready
for the First Choice program.

          Mother worked with someone at MHMR (Heidi)
on housing, and Heidi told Fry in either August or September 2010 that she gave
Mother the paperwork to fill out and was waiting on Mother to return it.  In
September, Mother told Boyles that she had spoken with her housing contact and
felt that she would be able to have a place to live by November; Boyles noted
that Mother was anxious to be able to show progress in housing and to have her
son returned to her.  As of October 6, 2010, Mother informed Goodman that she
had completed her application for housing and turned it in.

          Mother stayed in START for almost a year,
and this alarmed Fry because “it was an emergency arrangement that was to
provide a stepping stone for parents to get back on their feet.  And she had
been there longer than the time that they expected her to be there in order to
get a job and find housing.”

          Williams said that CPS did not have the
opportunity to see whether Mother had benefited from the services and to use
what she learned in the raising and care of her child because while Mother was
at the Salvation Army, she was provided with food and shelter, which other
parents typically have to provide on their own.  Further, Williams said that
the Salvation Army was not a permanent solution for housing and that even if
Mother had been admitted into First Choice, the program only lasted eighteen
months, and this was not acceptable to DFPS because DFPS required permanence
for the child.  If something went wrong, DFPS did not want J.T.V.H. in a
situation where he would be homeless.  Lastly, Williams described her
perception of the Salvation Army as “a pretty dangerous area,” stating that at
any given time, she had seen between twenty and forty transients outside and on
the inside of the facility just inside the doors.  START was housed in a
separate section behind locked doors, and Brauderick said that she went to the
Salvation Army to visit Mother over twenty times, that she never saw any
unsavory characters hanging around there, and that it was a safe place “and an
appropriate place for a child to be, if need be.”

          A week before the termination trial, Mother
left the Salvation Army shelter to live with M.V.H., even though she had told
her MHMR case manager that she could not go back to her father’s neighborhood
and stay clean.  Mother explained that she moved back in with M.V.H. because
earlier in the case, CPS had told her that “there’s no way Denton County is
going to approve of a child coming to a shelter” for visits or to live with her
there, and she recalled that at the preceding court appearance, DFPS’s counsel
had said, “You plan on bringing a child into a homeless shelter where there’s
pedophiles, drug addicts, and druggies coming in.”  From this, it appeared to
her that he was not receptive to placing J.T.V.H. with her at the homeless
shelter.

          Mother said that she had been clean for a
year by trial and that she and her family were talking about moving to Iowa,
where J.V.H. had just moved.  She said that, up until the week before trial,
her plan for J.T.V.H. had been for him to move into the Salvation Army with
her.  Her new plan was to move to Iowa with her family as soon as the house in
The Colony sold.  Mother admitted that the house in The Colony had not been
listed for sale yet and that J.V.H. had not yet purchased a house in Iowa.

          J.V.H. said that she did not think the
Salvation Army was the proper place to raise a small child and that if Mother’s
plan had been to raise him there, it was not a good plan.  Fry said that the Salvation
Army shelter is not an appropriate place to have a child because of the
exposure to lots of risky behaviors.

          Boyles admitted that, without M.V.H. and
J.V.H., Mother was not prepared financially to take J.T.V.H. home and
appropriately care for him or herself and that Mother did not have housing or day
care set up for him.

4.    Mother’s Employment

          Before her CPS case, most of Mother’s work
experience was her six-to-eight years of waitressing.  But Mother did not want
another waitressing job because most waitressing jobs involved nights, and the
bus did not run past ten p.m.  She applied for positions at a couple of
restaurants that were open during the day as well as for positions with retail
stores, an insurance company, and “various different places.”  Mother said that
she understood why the court had ordered her to seek and maintain employment:  “Because
a single parent should have a job to support her kid.”

          Meachem described Mother’s employment while
she lived at the Salvation Army as “sporadic.”  Mother tried three different
jobs:  One lasted around four months and involved passing out fliers from door
to door a few days a week for up to five hours per day.  Another was a temporary
job cleaning bathrooms.  Mother left a waitressing job at the Fox & Hound
on the last day of training because her trainer “was a chauvinist pig” and made
her extremely nervous.  She said she did not recall that Fox & Hound had
offered her extra training, and she denied refusing the offer.

          In July 2010, Fry visited Mother at the
Salvation Army.  It was around 10:30 a.m. but Mother was still asleep.  Mother
admitted that when Fry came to visit her that day, she was still in bed but
could have been looking for a job.  Fry said
there was no reason for Mother to still be unemployed because she is very
intelligent and physically healthy but lacks the motivation that someone who
really wanted her child back would have.  Boyles agreed that Mother was smart,
physically healthy, and capable of getting things done when she wanted to and
said the only explanation she had for Mother’s continued unemployment was
“[j]ust that she’s been having trouble finding [a job].”

5.    Plans for J.T.V.H.

          Mother stated at trial that her short-term
goal for J.T.V.H. was “[t]o get day care” for him and her long-term goal for
him was “just to try to make the best life for him
possible . . . and just ensure that he’s taken care of and
happy, and in sports.”  She admitted that she had to rely on others for transportation
and that she did not know how she would pay for day care for J.T.V.H., although
she stated, “I heard CPS helps with that.”  Mother admitted that she had not
looked into whether CPS could help her with day care and that she had not
visited any nearby day cares, choosing to “wait to see if [she] got him first.”[12] 
Mother’s plan to care for J.T.V.H. was to get a job and to live with her
parents while they supported her until she could get a car.[13]

          Mother admitted that her plan for J.T.V.H.
up until the week before trial had been for him to move into the Salvation Army
with her.  Before leaving the Salvation Army, she got on its “Shelter Plus” program
list but said that it would have taken another four months to get an apartment.
 Mother’s new plan was to move to Iowa with her family as soon as the house in
The Colony sold and to put J.T.V.H. in private preschool there, with J.V.H.
paying for everything.  J.V.H. acknowledged that she and M.V.H. were supporting
Mother because she did not have a job and that Mother had not had a steady job
since January 2009, but she stated, “[I]f she’s going to move with me, then she
has to pay her way.”

          At the time of the trial, J.V.H. was living
with her mother in Iowa while working as director of Faith Formations for St.
Cecilia Church; M.V.H. remained with the house in The Colony.  J.V.H. said they
did not have a date yet for M.V.H. to move to Iowa because they were waiting
for the outcome of the trial and hoped to move “as soon as we get [J.T.V.H.]
back.”  J.V.H.’s plan was for J.V.H., M.V.H., Mother, and J.T.V.H. to live in
Iowa, where they would enroll J.T.V.H. in a preschool that belonged to St.
Cecilia.  J.V.H. said that because she worked for the church, she would pay the
minimal cost for the school.

          Besides school, J.V.H.’s plan for J.T.V.H.
was for him to be involved in the “same things the kids did,” such as sports,
scouting, and family vacations.  J.V.H. said that J.T.V.H. needed Mother and
his grandparents, that she had a large, closely-knit extended family in Iowa,
and that she, Mother, and M.V.H. were committed to J.T.V.H. and to giving him a
better life than what he had had up until this point.

          Reynolds stated that she felt it was
appropriate for J.T.V.H. to remain with his foster family, who wants to adopt
him, and that this would be in J.T.V.H.’s best interest.  Mother said that she
felt like she and her family were ready to step up and take care of J.T.V.H.
again.

6.    Recommendations 

          DFPS agreed to extend Mother’s case beyond
the twelve-month deadline because in May 2010, Mother had completed some
services and was making progress on others, but Williams said that there had
been no change since the time the extension was granted—“[t]he only difference
is now she lives in The Colony, which she moved back [to] a week ago
yesterday,” despite Mother’s continued assertions during the case that she
could not go back to The Colony because all of her drug-using friends lived
there.  Williams said that, based on what Mother had told her throughout the
case, this was a bad choice.

          Williams said that DFPS was seeking
termination of Mother’s parental rights in J.T.V.H.’s best interest “[b]ecause
[J.T.V.H.] is in a stable, loving environment, and he’s there with his
half-sister, who he had a bond with.  He’s also been there for over a year, and
he does have attachments to the caregivers, as well, and at this point, that is
something that he definitely needs.”  In contrast, Mother is not stable and if
J.T.V.H. were sent home with Mother, this would create a risk for him because
there is no one there to monitor Mother.  Because of Mother’s history of
conflict with M.V.H., she and J.T.V.H. could end up homeless.  Williams said
that J.T.V.H.’s foster parents are willing to adopt him, and she believed that
this was in J.T.V.H.’s best interest.

          Reynolds testified that she spent around
ninety-nine hours—significantly greater than the minimum requirement of
fifteen—on the case before Fry took over so Reynolds could go on maternity
leave.  She met with Mother around three times a month, spoke with her about
the resources available to her, and encouraged her.  CASA’s position at trial,
based on observations, visits, and contact with Mother’s service providers, was
that Mother’s parental rights to J.T.V.H. should be terminated.  Reynolds
explained this recommendation, stating

[Mother], for the
duration of this case, has been at the Salvation Army and has not made any
attempts to find permanent safe housing for herself and for her child.  She has
made no attempts to find a career that will provide a full-time career with a
good-paying salary that she can support herself and her child.  [And] . . . [J.T.V.H.]
is placed in a loving home and is cared for and is with a half-sibling right
now.

 

          Fry spoke with Boyles, who told her that
Mother had no home and no job but that “we should help her find one.”  Fry said
that she believed Mother had a lot of resources available to her—through CASA,
CPS, and the Salvation Army—to do what Boyles suggested.  Fry stated that
CASA’s position was for termination of Mother’s parental rights because of
Mother’s lack of stability, housing, and employment.  In considering J.T.V.H.’s
best interest, Fry said that CASA considered his short-term and long-term physical
and emotional well-being and his caretakers’ abilities to provide for his
short-term and long-term needs.  Fry said that reunifying J.T.V.H. with Mother
would put J.T.V.H. at risk because Mother lived with M.V.H., whom she had
reported abusing her as a child.  Like CPS, CASA was concerned that if M.V.H.’s
and Mother’s relationship were to deteriorate, Mother and J.T.V.H. would be
homeless.

          Fry testified that J.T.V.H. was “in a
wonderful home” and that his current placement would not be a danger to him
because his foster parents have the parenting abilities to meet all of his
needs.  Fry said that she did not feel that Mother had the parenting abilities
to meet all of J.T.V.H.’s needs at this time.  She thought that J.T.V.H.’s
chances for permanency and stability were better with the foster parents, where
his half-sister also lives and with whom he has a bond and connection.  Fry
stated that termination of Mother’s parental rights was in J.T.V.H.’s best
interest because, “after a year of job training, housing, meals prepared,
transportation, counseling, all of those resources available to [Mother], she
still lacks employment and housing and hasn’t been able to demonstrate the
ability to care for herself or J.T.V.H.”[14]

          Boyles stated that she did not think that it
was in J.T.V.H.’s best interest to terminate Mother’s parental rights.  J.V.H.
testified that it was “absolutely not” in J.T.V.H.’s best interest for Mother’s
rights to him to be terminated, and Brauderick and McKinney said the same.




 

C.  Analysis

          Mother
complains that DFPS “wholly failed to present any competent evidence of the
facts” to support the best interest finding, that conclusory statements will
not support the finding, and that the evidence is undisputed that she was
drug-free for the year preceding the trial, and she argues that the fact that
she lived at the Salvation Army and failed to find gainful employment is not sufficient
to support the best interest determination.

          DFPS responds that the evidence is
sufficient because Mother demonstrated a complete lack of stability in housing
and employment, admitted that if J.T.V.H. were returned to her, she would move
in with M.V.H., who had abused her as a child, and admitted that she would be
totally dependent on M.V.H. and J.V.H.  Further, Mother’s psychologist and the
Salvation Army representative both testified that Mother should not have
custody of J.T.V.H., and DFPS and CASA witnesses testified that termination was
in J.T.V.H.’s best interest.

          Evidence of a parent’s unstable lifestyle
can support a factfinder’s conclusion that termination is in a child’s best
interest, and “[a] parent’s drug use, inability to provide a stable home, and
failure to comply with a family service plan support a finding that termination
is in the best interest of the child.”  In re M.R., 243 S.W.3d 807, 821
(Tex. App.—Fort Worth 2007, no pet.).

          The trial court ordered Mother to complete
the CPS service plan, and, for the most part, Mother complied.  Neither party
disputes that during the year and a half that her case was open, Mother stayed
drug-free for a year.  Cf. id.  Neither do they dispute that, although
Mother eventually underwent her psychological evaluation, attended weekly
counseling sessions, completed her parenting classes, underwent a drug and
alcohol assessment, took regular random drug tests, and attended visits with
J.T.V.H., she failed to establish and maintain safe, stable, and appropriate
housing and suitable employment for at least six months and failed to pay child
support every month.[15] 
See id.

          Based on the testimony by Mother and J.V.H.,
the jury could have concluded that Mother and M.V.H. would be a volatile
combination to expose three-year-old J.T.V.H. to, particularly with regard to
physical abuse.  Further, Mother and J.V.H. had different impressions of what
J.V.H. would pay for, assuming Mother followed through with moving to Iowa,
although both agreed that Mother needed a job to support J.T.V.H.  As presented
by their testimonies, the lack of stability regarding Mother’s plans for
J.T.V.H. and her parenting abilities, Mother’s inability to establish and
maintain suitable housing and employment before trial, and J.V.H.’s inability
to supervise M.V.H. and Mother from a distance was sufficient for the jury to
reasonably form a firm belief or conviction that it was in J.T.V.H.’s best
interest to terminate Mother’s parental rights.  See J.P.B., 180 S.W.3d
at 573; see also In re J.O.A., 283 S.W.3d 336, 346 (Tex. 2009) (stating
that recent, short-term improvements do not conclusively negate the probative
value of a long history of drug use and irresponsible choices).  Further,
because prompt and permanent placement of the child in a safe environment is
presumed to be in the child’s best interests, see Tex. Fam. Code Ann. §
263.307(a), the conclusions and credibility determinations that the jury could
have made from Mother’s and J.V.H.’s testimonies were reinforced by the
testimonies of CASA workers Reynolds and Fry, CPS caseworker Williams, and
Mother’s various other caseworkers and counselors, as well as her MHMR,
Salvation Army, counseling, and psychological evaluation records.  See J.O.A.,
283 S.W.3d at 346; J.P.B., 180 S.W.3d at 573.  We conclude that the
evidence is legally sufficient to support the best interest finding, and we
overrule Mother’s second issue.

IV.  Rule of Evidence 605

          In her first issue, Mother argues that the
trial court violated evidence rule 605 when it allowed the State to elicit
testimony regarding the trial court’s termination of Father’s parental rights.  Specifically,
she complains that admitting evidence that Father’s parental rights had been
terminated prior to trial “constitute[d] a judicial comment on the facts of the
case before the jury” and created a presumption that shifted the burden of
proof to Mother.

          Mother admits that she did not object at the
time the complained-of testimony was elicited, but she points out that rule 605
states that no objection is necessary to preserve the point.  See Tex.
R. Evid. 605.  In response, the State points out that the rest of the rule
states that the “judge presiding at the trial may not testify in that trial
as a witness,” and that the complained-of testimony was not by the trial
judge; rather, it was Mother’s.  See id. (emphasis added).

          The complained-of testimony occurred after
Mother stated that Father, to her knowledge, had never answered or appeared in
the termination suit and that he had never paid any child support for J.T.V.H.  She
stated that for a couple of months after J.T.V.H. was born, she played
“stay-at-home mom” while Father worked, but it did not work out between them
because he partied on the weekends and was hardly ever home.  DFPS’s counsel
then asked Mother whether the trial court terminated Father’s rights prior to
trial beginning, and Mother said that she did not know.  DFPS’s counsel
reminded Mother that on the day before, the CPS caseworker had testified to the
trial court about Father’s lack of participation in his service plan and his
failure to appear.  Mother then agreed that the trial court had granted
termination of Father’s parental rights to J.T.V.H.  The trial court said
nothing during the entire conversation.

          Mother argues that “it is clearly
inferential that the jurors considered the Judge’s actions in the father[’]s
termination as a judicial comment on the evidence against [her] in making their
verdict.”  Mother relies on In re M.S., 115 S.W.3d 534, 537–38 (Tex. 2003),
and Joachim v. Chambers, 815 S.W.2d 234, 239 (Tex. 1991) (orig.
proceeding),[16]
to support her argument that her testimony constituted a specific
finding by the trial court “as to the fitness of the father.”

          In M.S., the trial court admitted its
temporary orders into evidence.  115 S.W.3d at 536–37.  The supreme court held
that while admitting the orders as evidence to support DFPS’s position that the
parent had failed to comply with court orders was not in itself inappropriate,
the trial court’s factual findings in the orders should have been redacted so
that the jury could draw its own conclusions about the parent’s compliance.  Id.
at 538.  It held that the error was harmless because the parent had the burden
to show that she had been prejudiced by the orders’ admittance and there was
nothing in the record showing that DFPS specifically based any of its arguments
on the findings or that DFPS even pointed out the findings to the jury, and the
record contained ample other evidence that the parent did not comply with the
trial court’s orders.  Id. at 538–39.

          Assuming without deciding that Mother
properly preserved this argument,[17]
we hold that the trial court did not err when, as pointed out by the State, Mother
testified that Father’s rights had been terminated.  It is not clear to us how Mother’s
testimony could fall under rule 605, even by implication, or how this would
shift the burden of proof to Mother, but like in M.S., there is nothing
in the record showing that DFPS specifically based any of its arguments to
terminate Mother’s rights on the fact that Father’s rights had been terminated
before trial or that DFPS pointed out the finding to the jury in its closing
argument, and—as set out in extensive detail above—the record contained ample
other evidence to support termination of Mother’s parental rights without any
consideration of Father at all.  See id.  Therefore, we overrule
Mother’s first issue.

V.  Conclusion

          Having overruled both of Mother’s issues, we
affirm the trial court’s judgment.

 

                                                                             PER
CURIAM

 

PANEL:  MCCOY, DAUPHINOT, and GARDNER, JJ.       

 

DELIVERED:  October 13, 2011









[1]See
Tex. R. App. P. 47.4.





[2]The
trial court also terminated Father’s parental rights to J.T.V.H., but Father
does not appeal.





[3]Mother
also sets out a factual sufficiency standard of review, but her argument—and
the only relief she seeks—is based on legal sufficiency.





[4]Father
was absent throughout the case.





[5]Father
and S.T. divorced in 2006 after she caught him cheating on her.





[6]Several
attempts were made to locate Mother during her month-long relapse, but no one
was able to find her, and she did not check on J.T.V.H. during that time.





[7]Reynolds
was not at a visit when Mother brought J.T.V.H. toys and played with him on the
floor or for Mother’s Easter visit, when Mother brought J.T.V.H. an Easter
basket.  She was not at the visit when Mother and her father brought J.T.V.H. a
birthday cake and toys for his birthday.  And she was not at the visits at
McDonald’s, where Mother played on the slide with J.T.V.H. and they ate ice
cream together.





[8]Fry
testified that she had interacted with Mother on many occasions, had never
received an indication that Mother was afraid of her, and was surprised to hear
that Mother was afraid of her.





[9]J.V.H.
explained that on November 15, 1997, M.V.H.’s son was late for a school
wrestling tournament and the school bus had already left, so M.V.H. sped to
catch up with the bus.





[10]J.V.H.
explained that on October 11, 2000, M.V.H. drove up, heard Mother’s boyfriend
curse at J.V.H. and saw him push her, lost his temper, and hit the boyfriend.





[11]Reynolds
said that S.T. frequently invited Mother to call about J.T.V.H. but that Mother
seldom did so; when she did call, it would be at unusual hours, like three a.m.





[12]When
asked by DFPS’s counsel whether she understood that without a pending case, CPS
could not provide her with day care or any services, Mother replied, “That’s
strange, I heard otherwise, but that’s fine, if that’s what you’re telling me. 
I understand that.”





[13]In
Fry’s July 2010 visit to Mother at the Salvation Army, when Fry asked Mother
about her long-term and short-term plans, Mother’s answer was “housing and
employment,” but with no specifics.





[14]Fry
also said that she did not believe that J.T.V.H. was bonded with Mother, but
she never requested a bonding assessment.





[15]According
to Fry, Mother made two $50 payments and “then a couple of times she had
paychecks, and it was $5.77 and $10-and-something,” which was insufficient for
compliance.





[16]Joachim,
which involved the issue of whether a retired district judge who continued to
serve as a judicial officer by assignment could testify as an expert witness in
a particular case, is inapposite.  815 S.W.2d at 235, 240 (stating that under
the relevant canon of judicial conduct, the retired district judge could not
testify as an expert in the particular case at issue).





[17]Mother
did not raise this argument in her statement of points but argues that the
statute requiring the statement of points is void.